[Dkt. No. 27]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

---

SHERRY R. MOORE,

      Plaintiff,

        v.

JEH CHARLES JOHNSON,

      Defendant.

Civil No. 14-4171 (RMB/AMD)

**OPINION**

---

**APPEARANCES:**

**William B. Hildebrand, Esq.**
Law Offices of William B. Hildebrand, LLC
36 Tanner St., Suite 300
Haddonfield, N.J. 08033
    *Attorney for Plaintiff*

**Anne B. Taylor, Esq.**
Office of the U.S. Attorney
District of New Jersey
401 Market St., 4th Fl.
P.O. Box 2098
Camden, N.J. 08101
    *Attorneys for Defendant*

**BUMB,** UNITED STATES DISTRICT JUDGE:

THIS MATTER comes before the Court upon the filing of a motion for summary judgment by Defendant Jeh Charles Johnson, the Secretary of the United States Department of Homeland Security (the "Defendant").  (Mot. Summ. J. [Dkt. No. 27]).  For the reasons set forth below, Defendant's motion for summary judgment is GRANTED.

I.  **BACKGROUND**

A. **The Promotion Process**

Plaintiff Sherry Moore (the "Plaintiff") joined the Immigration and Naturalization Service ("INS") in 1997 and transitioned into Immigration and Customs Enforcement ("ICE") when INS merged with the Department of Homeland Security. (Def.'s Rule 56.1 St. of Facts & Pl.'s Resps. ("Def.'s St. & Pl.'s Resps.") ¶ 3 [Dkt. Nos. 27-1, 32-2]).  During Spring 2012, Plaintiff, while serving as an Immigration Enforcement Agent, applied for a promotion to the position of Deportation Officer ("DO").  (Id. ¶¶ 2-4, 7).  Plaintiff learned of the position through a friend and submitted a resume and responses to questions about her knowledge, skills and abilities through the USA Jobs website.  (Id. ¶ 7).

Pursuant to the listing, the position for which Plaintiff applied was open to "Current U.S. Immigration and Customs Enforcement[], Enforcement and Removal Operations (ERO) employees in the competitive service who are serving on a career or career-conditional appointment, within the ERO Newark Field Office Directorate."  (Id. ¶ 19).  Applicants' materials, like those submitted by Plaintiff, were initially assessed by ICE Human Resources personnel in Laguna Niguel, California.  (Id. ¶ 21).  After this initial review, a list of those applicants who were deemed to have the minimum qualifications – including

2

Plaintiff – was given to the Newark Field Office for further
consideration.  (Id. ¶¶ 22-23).  The list given to the field
office also included approximately 90 other candidates for
promotion.  (Id. ¶ 27).

  After the list was given to the Newark Office, employees
there began designing and implementing the assessment process.
(Id. ¶ 29).  Defendant contends that John Tsoukaris, the Field
Office Director, coordinated this hiring effort in conjunction
with Gregory Kendrick, the Deputy Field Office Coordinator.  (Id.
¶¶ 29-30).  Plaintiff, on the other hand, contends that it was
Kendrick who took the lead because Tsoukaris was on assignment
in Washington D.C., although Plaintiff does not contest the fact
that Tsoukaris was at least generally involved.  (Id. ¶¶ 29-32,
35).  Regardless of the exact employee in charge, it is not
disputed that given the volume of applications, a two-step
evaluation process was put in place to first assess candidates.
(Id. ¶ 30).  This process involved a first phase where
supervisors rated resumes pursuant to a rubric that had
historically been used, and then a second phase where
sufficiently high-scoring individuals from the resume phase took
a writing assessment.  (Id. ¶ 31).  Though a writing sample had
not historically been taken in assessing promotions to DO
positions, it was thought that it would help identify the best

qualified candidates.  (Id. ¶¶ 40, 42).[1]  It is not disputed that since this specific round of hiring, Newark has continued to use writing samples.  (Taylor Supp. Dec. Ex. V ("Vogler Dep.") at 19:6-13 [Dkt. No. 34-2] ("I believe ever since 2012 we [have] used a writing sample for all DO positions.").[2]

Although the parties dispute whether Tsoukaris or Kendrick oversaw the hiring process, it is undisputed that the Assistant Field Office Director Mark Vogler was in charge of operations support and he coordinated the assessment process.  (Def.'s St. & Pl.'s Resps. ¶ 43).  Tsoukaris and Kendrick retained the responsibility to create a panel of supervisors to review applicants and make recommendations for selection, which they did.  (Id. ¶ 45.)

The first-phase resume evaluation was conducted by three supervisors.  (Id. ¶¶ 53-54).  Prior to commencing their review of the resumes, these evaluators were provided with rating factors to use during their evaluation, along with a chart they

---

[1] Plaintiff does not genuinely dispute that Tsoukaris and Kendrick thought a writing sample was a way to assure qualified candidates, replying only broadly to several paragraphs of factual statements with the argument that "It was not solely Tsoukaris's decision to add the writing sample. Rather, Kendrick was actively involved in this decision as well."  (Id. ¶ 40).
[2] One employee involved in the review process, Nnamdi Aneke, was involved in hiring DOs for a different office (New York) after his experience in this case and a writing sample was not used. (Pl.'s 56.1 St. of Facts & Def.'s Resps. ("Pl.'s St. & Def.'s Resps.") ¶ 19 [Dkt. Nos. 32-1, 32-4]).

were to fill out along the way, which tracked the applicants'
scores.  (Id. ¶ 54).  The rating form, which is designed to
assess education and experiences applicants had, was created by
Kendrick before the hiring process relevant to this case and had
been used for assessing resumes during prior promotion
evaluations.  (Id. ¶¶ 55, 56).  Over several days, the three
supervisors convened in a conference room and reviewed resumes.
(Id. ¶ 57).  Scores were generated based on the applicants'
resumes and a supervisor, whom Plaintiff had consistently gotten
along with, evaluated Plaintiff's resume.  (Id. ¶¶ 63-65).
According to Plaintiff's "DO Rating Factors" Score Sheet, she
received 16 out of 22 possible points in the resume phase.
(Taylor Dec. Ex. O [Dkt. No. 27-6]).  While Vogler anticipated
the top thirty-seven candidates would advance to the writing-
sample stage, fifty-eight candidates were ultimately invited to
take the writing test, including Plaintiff.  (Def.'s St. & Pl.'s
Resps ¶¶ 67-68).

The second-phase writing assessment consisted of providing
the applicant with one of six factual scenarios and a direction
to respond to a particular task.[3]  (Id. ¶ 69).  It is undisputed
that these scenarios were reviewed by Tsoukaris prior to being

---

[3] The use of different scenarios was designed by Tsoukaris and
Kendrick to make the process fair for applicants who completed
the writing sample at different times.  (Id. ¶ 71).

used in the process.  (Id. ¶ 70).  The writing assessments were scheduled, proctored, and anonymized for blind-grading by Noel Elia.  (Id. ¶ 72).  The anonymous writing samples were then blind-graded by another employee, Kerry Gill, for clarity, conciseness, and capacity to extract and present pertinent facts from the problem that was used as a prompt for the sample.  (Id. ¶ 33).  Tsoukaris and Kendrick selected Gill for this process because they felt he wrote well and were confident he could objectively assess writing samples.  (Id. ¶ 50).  In grading the samples, Gill used a rubric that had been provided to him by Vogler.  (Id. ¶ 73).  Vogler, in turn, got this rubric by searching the internet.  (Id. ¶ 75).  After confirming methodology questions with Vogler and Kendrick, Gill did not consult with anybody else while grading.  (Id. ¶ 78).

Ultimately, Plaintiff was awarded 6 points out of 10 by Gill for her writing sample.  (Id. ¶ 82).  While she was awarded 4 out of 4 possible points for content and structure, Plaintiff was awarded only 2 out of 6 points for style and organizational development.  (Taylor Dec. Ex. P).  Notes on the scoring page indicate that issues identified in the writing sample were "commas," "subject/verb agreement," "correct pronoun (I vs. myself)," and "poor wording."  (Id.)  These comments appear to match corresponding comments written directly on Plaintiff's writing sample, which was attached to the scoring sheet.  (Id.)

Gill, because he was grading the writing samples blindly, did not know the race, gender, or EEO history of the authors writing the samples he graded, nor did he have any contact with applicants in the grading process.  (Def.'s St. & Pl.'s Resps. ¶¶ 84-85).

Plaintiff's final score, including her resume assessment, was 22.  (Id. ¶ 90).  The lowest scoring individuals referred for consideration beyond the resume and writing phases was 23. (Id. ¶ 91).  As such, Plaintiff did not make it out of the writing sample round.  Defendant's Statement of Facts accurately summarizes the sieving process by which the ninety applicants were trimmed down:

> Of the approximately ninety people whose resumes were reviewed, fifty-eight people took a writing sample, and thirty-three individuals made it to the final selection list (which included some of the names twice, as people applied for the promotion in both Newark and Marlton).

(Id. ¶ 92).  These results were conveyed in an August 7, 2012 memorandum to Kendrick, who was identified on the memo as the selecting officer because Tsoukaris was away from the office. (Id. ¶¶ 93, 96).  In the end, twenty-three individuals were selected for the promotion.  (Id. ¶ 97).

### B. **Plaintiff's Interactions with Kendrick**

Plaintiff's factual and legal arguments focus on her interactions with Kendrick prior to the promotion process. Dating back to 2007 – several years before the above-described

events – Plaintiff asserts that Kendrick denied her two promotion opportunities.  (Id. ¶ 105; Pl.'s St. & Def.'s Resps. ¶ 12).  However, between 2008 and 2012, Plaintiff had limited interaction with Kendrick, who was detailed to Rome, only to return a few months before the promotion application at issue in the instant case.  (Id. ¶ 107).

Plaintiff contends the previous two promotion denials as well as the promotion denial in this case arise:

> in retaliation for her assistance in getting Marvin Dargan's job back.  Kendrick fired Dargan to thwart a civil rights investigation into the placement of a swastika on his desk.  Kendrick warned Plaintiff not to assist Dargan, and if she did, "there would be consequences."  Despite the threat, she chose to "do the right thing" and got him his job back.

(Pl.'s St. & Def.'s Resps. ¶ 10).

## II.  **LEGAL STANDARD**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  14 Fed. R. Civ. P. 56(a).  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  Id.

When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all

8

reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 252. Further, a court does not have to adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 373, 380 (2007). In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P.

56(e)).  The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995); Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not defeat summary judgment.").

**III.  <u>ANALYSIS</u>**

Plaintiff brings three causes of action under the Civil Rights Act of 1964 (Title VII): (1) race discrimination; (2) gender discrimination; and (3) retaliation.  (Compl. ¶¶ 1, 13-29 [Dkt. No. 1]).  Title VII prohibits employment discrimination on the basis of race, color, religion, sex or national origin.  42 U.S.C. § 2000e-2.  Claims of race or gender discrimination, as well as retaliation, fall under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 41 U.S. 792, 803-805 (1973.  Under that framework, "a plaintiff must first establish a <u>prima facie</u> case" that she was discriminated or retaliated against.  Thompson v. Bridgeton Bd. of Educ., 9 F. Supp. 3d 446, 454 (D.N.J. 2014), <u>aff'd,</u> 613 F. App'x 105 (3d Cir. 2015) (citing McDonnell Douglas, 411 U.S. at 802) (race discrimination); Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 (3d Cir. 2006) (gender discrimination); Tourtellotte v.

10

Eli Lilly and Co., 636 F. App'x 831, 841 (3d Cir. 2016)
(retaliation).  Typically, establishing a prima facie case is a
low bar for a plaintiff to meet.  Scheidemantle, 470 F.3d at
539.

Once the Plaintiff has met the elements of a prima facie
case, "the burden then shifts to the employer to articulate a
legitimate, nonretaliatory or nondiscriminatory reason for its
actions." Tourtellote, 636 F. App'x at 842.  If the employer is
able to demonstrate such a reason, "the burden then shifts back
to the plaintiff to prove that the employer's nonretaliatory or
nondiscriminatory explanation is merely a pretext for the
discrimination or retaliation." Id. (citing McDonnell Douglas,
411 U.S. at 802-04).  At the pretext stage in the context of
summary judgment, the plaintiff "must point to some evidence,
direct or circumstantial, from which a factfinder could
reasonably either: (1) disbelieve the employer's articulated
legitimate reasons; or (2) believe that an invidious
discriminatory reason was more likely than not a motivating or
determinative cause of the employer's action." Id.  (quoting
Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006)
(internal quotation marks omitted).

A. **Race and Gender Discrimination**

 i. ***Prima Facie* Case**

"The elements of a prima facie case are the same for discrimination claims on the basis of sex and race."  Id. at 842 (citing Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 249 (3d Cir. 2006)).  To establish a prima facie case of either gender-based or race-based discrimination, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination. Id.

In this case, for both the race and sex discrimination claims, Defendant concedes that the facts establish the first three elements of a prima facie case of race and sex discrimination.  Plaintiff is an African-American woman, she was qualified for a DO position, and she was denied a promotion. (Def.'s Br. at 7-8).  As such, the only issue at summary judgment for the first two claims is whether the denial of the DO promotion gives rise to an inference of unlawful discrimination.  Defendant contends that it does not.

Plaintiff, in arguing that the record shows a prima facie case of discrimination, points to several facts from which she argues an inference of unlawful discrimination arises.  First,

Plaintiff argues that the use of the writing assessment, something that had not been used before in this context gives rise to such an inference, particularly when writing ability was also assessed during the resume phase. (Pl.'s Br. at 7). Second, she argues that the involvement of Kendrick in the selection process – a supervisor with whom she had a previous union-related disagreement – gives rise to such an inference. (Id. at 7-9). Third, she argues that the application process's inclusion of a writing sample and unapproved resume rating system is a violation of policy or is otherwise invalid. (Id. at 6). Fourth, she argues that she has historically been denied leadership positions or promotions because of her race or gender, which would have yielded a higher score in the resume phase. (Id. at 6-7). Even viewing the facts in the light most favorable to Plaintiff, the Court disagrees that any of these contentions demonstrate, individually or collectively, facts from which an inference of unlawful discrimination could be drawn.

Plaintiff's first argument – the fact that a writing assessment had never been used before – does not give rise to an inference of unlawful gender or race discrimination. Under Plaintiff's theory, any new method of assessing candidates whatsoever would give rise to a discrimination claim solely by the fact that it was new. Plaintiff has pointed to no evidence

13

that the resume or writing assessment were conducted in a manner designed to discriminate against her because of her race or gender; she does not contend she was evaluated any differently than anyone else.  Importantly, it is uncontested that the writing sample (which Plaintiff appears to take the most umbrage with) was graded blindly by Gill, who was unaware of the race or gender of the writers.  (Def.'s St. and & Pl.'s Resps. ¶¶ 84-85).

Importantly, it is also uncontested that writing is an important skill for DOs to possess, and that writing samples have continued to be used for hiring since the initiation of the process.[4] (Vogler Dep. at 19:6-13; Tsoukaris Dep. 19:3-11, 21:8-14).  It is those two facts that also inoculate the basic fact that the important skill was assessed at two different stages, into which Plaintiff reads too much.[5]  The fact that a critical skill was twice-evaluated in a job selection process, without more, simply does not give rise to an inference that the purpose

---

[4] The Court's reasoning is not altered by deposition testimony that another office does not use writing samples in evaluating DO promotions.  (Pl.'s Br. Ex. D ("Aneke Dep.") 9:21-25).
[5] Tsoukaris also indicated in his declaration that the reason writing samples were taken in addition to assessing writing in resumes was that there was no guarantee in assessing resumes that an accurate picture of the applicant's writing skills could be taken, given the resumes could have been written by others. (Tsoukaris Dec. ¶ 5).

of so doing was to discriminate against Plaintiff on the basis
of her race or gender.

Plaintiff's second argument about her history with Kendrick
and his involvement in hiring, while under different
circumstances having the potential to give rise to an inference
of discrimination, does not do so here.  Taking the facts in the
light most favorable to Plaintiff, this Court treats the process
as if it were led by Kendrick, who was the selecting official.
This Court must also assume Plaintiff is correct when she states
that Kendrick vaguely told her there would be "consequences" for
her after she assisted Dargan in recovering his job in 2004.
Nevertheless, this argument suffers from the fatal flaw that
Plaintiff has not pointed to any evidence in the record
suggesting that Kendrick knew that Plaintiff wrote poorly or
that a writing sample would weed Plaintiff out of contention for
a DO position.  Plaintiff has pointed to no evidence that
Kendrick even knew Plaintiff had applied when the writing
assessment was devised.  Even assuming that Kendrick knew
Plaintiff applied for the position when he formulated the
writing assessment and that he also knew she was a poor writer
who would be weeded out by the writing sample, Plaintiff has not

pointed to any facts suggesting such conduct was be based on her race or gender.[6]

Plaintiff's third argument, that the application process was out-of-compliance with regulations for hiring or was improperly developed in-house, fares no better.  (Pl.'s Br. at 6).  Plaintiff has pointed to no case law which indicates that an out-of-compliance promotion process by itself gives rise to an inference of discrimination based on race or gender.  In the same vein, the fact that the application process allocated 5 out of 30 points to management or supervisory experience when the position was a non-management, non-supervisory position does not give rise to the inference that Defendant discriminated against Plaintiff.  This evidence at best gives rise to the inference that the process was poorly-designed, which is unrelated to whether an inference of discrimination arise.

Plaintiff's final argument that her resume evaluation was under-scored because she was improperly denied acting leadership experience is not sufficient to overcome summary judgment.  Plaintiff vaguely contends that "other, non-African American

---

[6] The exact circumstances of the dispute with Dargan are hard to discern from the record.  It appears that in 2004, a swastika was placed on Dargan's desk and Kendrick was tasked with investigating the incident, but, according to Plaintiff, Kendrick instead decided to fire Dargan.  Plaintiff stepped in and prevented the firing.  Kendrick told her there would "be consequences" for her involvement.  (Moore Dep. 93:4-21).

females were given [the] opportunity" to gain leadership experience which would have yielded an additional one to two points in the resume review stage.  This argument is based upon Plaintiff's deposition testimony that she was told by an employee that a second-line supervisor of Plaintiff stated she was "too ethnic" to represent the United States in court and that for a particular leadership role.  Plaintiff also points to two promotions that were denied to her by Kendrick in 2007, purportedly because Plaintiff assisted Dargan.

As an initial matter, this argument assumes that if Plaintiff's score had been higher than the lowest scoring person to make it through the writing sample round to the final list, she would have been selected for the promotion.  See Bailey v. Principi, 2003 WL 22245100, at *6 (E.D. Pa. Aug. 20, 2003) ("[T]he plaintiff . . . must demonstrate the existence of sufficient facts to allow him to prove by a preponderance of the evidence that a prima facie case of discrimination exists that goes beyond the plaintiff's mere speculation.").[7]  More fundamentally, this Court cannot credit what Defendant correctly identifies as an attempt to "bootstrap in years-old allegations of discrimination through a complaint regarding a specific

---

[7] This was not a given.  For instance, one person who scored a 19 on his or her resume sample, and received the same writing score as Plaintiff, was not selected for the position.  (Taylor Dec. Ex. R).

employment action."  (Def's Br. at 6 n.2); see also Cardenas v.
Massey, 269 F.3d 251, 255 (3d Cir. 2001) ("Title VII claims must
be the subject of a charge filed with the EEOC within either 180
days or 300 days of the complained-of unlawful employment
practice, depending upon whether the state has an anti-
discrimination law, and a complaint must be filed in the
district court within 90 days of receipt of a right-to-sue
letter from the EEOC.") (internal citations omitted).
Plaintiff's complained-of comments and denied promotions
occurred between 2004 to 2007.[8]  (Pl.'s Ex. C at 90:3-5, 93:4,
125:22-25).  That sort of temporal remoteness does not give rise
to an inference of unlawful discrimination in the context of
Plaintiff's promotion.

    Even viewing the record in the light most favorable to
Plaintiff, there are insufficient facts put forth to support an
inference of unlawful discrimination based on race or gender.
Plaintiff, therefore, cannot demonstrate a prima facie case of

---

[8] While the comment suggesting Plaintiff was "too ethnic" to
represent the United States in court certainly could give rise
to an inference of unlawful race-based discrimination under
other circumstances, it was not made by Kendrick and is
unconnected to the adverse employment action in this case.  To
the extent they would have factored into Plaintiff's resume
review score, the denial of promotions by Kendrick in 2007,
which Plaintiff contends was due to Plaintiff's assistance of
Dargan, does not give rise to an inference of unlawful
discrimination because it would not have anything to due with
Plaintiff's race or gender.

18

discrimination.  Accordingly, this Court GRANTS Defendant's motion for summary judgment on Plaintiff's race and gender discrimination claims.

**B. <u>Retaliation Claim</u>**

In order to make a <u>prima facie</u> case of retaliation, a plaintiff must show: (1) that she engaged in protected employee activity; (2) that there was an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) that there is a causal connection between the employee's protected activity and the employer's adverse action. <u>Marra v. Phila. Housing Auth.</u>, 497 F.3d 286, 300 (3d Cir. 2007).

Defendant concedes that the record establishes the first two elements in Plaintiff's favor, leaving only causation to provide grounds for summary judgment.  In order to demonstrate a causal link for the third element of a <u>prima facie</u> claim of retaliation, a plaintiff may rely on a "broad array of evidence."  <u>Id.</u>  For instance, in narrow circumstances, the proximity between the protected activity and the adverse action may give rise to a claim of discrimination.  In other circumstances, antagonistic behavior by the employer, inconsistent reasons for the adverse action, or treatment of other employees may give rise to an inference.  <u>Id.</u>

Here, Plaintiff concedes the timing of the events in this case is not unusually suggestive of causation between her

protected activity and her failure to be promoted.  (Pl.'s Br. at 9).  Instead, Plaintiff points to Kendrick's role in the process and his prior statement that "there would be consequences" in the Dargan matter, as well as Kendrick's denial of two previous promotions of Plaintiff.

The Court holds that these incidents, all of which occurred years prior to the adverse employment action in this case, do not establish causation for purposes of a retaliation claim. While temporal proximity is not a requirement, the causal link here is broken not just by the years of separation, but by the abject speculation required to assume that Kendrick knew Plaintiff was a poor writer, knew that she had applied for the position when the writing sample was implemented, and knew how Gill would grade one of the several different writing prompts Plaintiff would be required to take.  Plaintiff does not assert the subject-matter of the writing sample was designed to eliminate her.  Plaintiff does not contend that the writing sample was administered to her under materially different conditions than it was administered to anyone else.  Absent showings of this sort, plaintiff does not make out a <u>prima facie</u> case.

Put differently, Plaintiff's entire <u>prima facie</u> case of retaliation is built on the argument that because Kendrick was angered by Plaintiff's protected decision to speak up for

20

Dargan, he retaliated against her by deliberately denying her
the promotion.  In many instances, causation might be
demonstrated in such cases because the temporal proximity is
uncanny or the manner of the denial telling.  Those uncanny or
telling facts give rise to the finding of causation, and they
are lacking here.  The record simply puts forth no evidence from
which the inference can reasonably be drawn that Kendrick
designed the seemingly neutral and multifaceted review process
to retaliate against Plaintiff.

### C. **Pretext**

Finally, even if this Court did find that Plaintiff was
able to establish a prima facie case of discrimination or
retaliation based on the above-discussed facts, which she
cannot, it nevertheless would grant summary judgment in favor of
Defendant.  There is not sufficient record evidence to permit a
jury to find that Defendant's proffered reason for the adverse
employment decision – that Plaintiff scored insufficiently
during the first two rounds of evaluation – is pretextual.

In support of meeting their burden under the McDonnell
Douglas burden-shifting analysis, Defendant has proffered the
reason that Plaintiff was not promoted because she did not
achieve a sufficient score in the neutrally-administered writing
component of the hiring process.  (Def.'s Br. at 19).
Plaintiff's counterargument is that the hiring process, and

particularly the writing assessment portion of it, was discriminatory or retaliatory and the supposedly neutral two-phase hiring process was pretext for Kendrick's desire to unlawfully deny Plaintiff the promotion.  As evidence for this, Plaintiff cites a series of supposed inconsistencies and problems in the hiring methodology, along with Kendrick's troubled history with Plaintiff.  These arguments, even when viewing the facts in the light most favorable to Plaintiff, do not provide a basis from which a reasonable jury could determine Defendant's reason for denying Plaintiff the promotion is pretextual.

With regard to her arguments that it made no sense for the panel to twice evaluate writing skills or over-weight management or supervisory experience, the Court finds that the uncontroverted records indicates the multilayered review process was designed to remove "the effects of individual favoritism or animus." Gillyard v. Geithner, 81 F. Supp. 3d 437, 447 (3d. Cir. 2015).  While Plaintiff may have qualms with the individual measures by which her application for promotion was adjudicated, she has not pointed to any inconsistencies or implausibilities in how she was assessed that could undermine the legitimate reasons that have been put forth for the evaluation method.  Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).  As Kautz set forth, "[a]n employer may not use

evaluating criteria which lacks any relationship at all to the performance of the employee being evaluated because to do so would be inconsistent with and contradictory to the employer's stated purpose.  Absent this type of violation of the Fuentes standard, we will not second guess the method an employer uses to evaluate its employees." Id.  Plaintiff simply has not pointed to any metric by which she was evaluated that bears no relationship at all to the performance of the employee being evaluated; management and supervisory experience can still be relevant to hiring for a non-management or non-supervisory position.  The writing sample itself was certainly well-tailored to the writing intensive nature of the position.

Moreover, even if Kendrick had a desire to retaliate against Plaintiff for her previous conduct undermining his firing of Dargan, he could not have done so.  Plaintiff was eliminated by the first two phases of the DO promotion process, which were carried out by supervisors who evaluated Plaintiff's resume and writing under the same standards as other applicants. Yet again, Kendrick's involvement at a high level designing the evaluation process along with his Tsoukaris, against whom Plaintiff makes no allegations of animus, does not show that the evaluation process was a pretext absent any criticisms in its application or methodology other than it was poorly designed. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) ("To

discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."). In opposition to summary judgment, Plaintiff has not identified weaknesses in the evaluation of Plaintiff's candidacy from which a reasonable factfinder could infer that Defendant denied Plaintiff's promotion for any other reason than that her composite score was insufficient to advance to the next round. Id.

In light of the above, even if Plaintiff had established a prima facie case of discrimination or retaliation, the Court additionally holds that Plaintiff has failed to establish that the proffered non-discriminatory explanation for the employment decision is a pretext. As such, summary judgment is proper in favor of Defendant on this additional ground.

## IV.  **CONCLUSION**

In sum, for the above-stated reasons, Defendant's motion for summary judgment is GRANTED. An appropriate Order follows.


DATED: December 22, 2016


s/Renée Marie Bumb

24

RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE